UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANA SOFT PTY LTD,<br><br>    Plaintiff,<br><br>    v.<br><br>META PLATFORMS, INC.,<br><br>    Defendant. | Case No. 25-cv-03821-TSH<br><br>**ORDER DENYING DEFENDANT'S MOTION TO DISMISS PURSUANT TO RULE 12(b)(6)**<br><br>Re: Dkt. No. 28 |

## I.    INTRODUCTION

Plaintiff Dana Soft Pty Ltd ("Dana") brings this contract action against Defendant Meta Platforms, Inc. ("Meta"), alleging Meta breached the terms of the parties' agreement under Meta's Audience Network program. ECF No. 21 (First Amended Complaint). Pending before the Court is Meta's Motion to Dismiss pursuant to Rule 12(b)(6). ECF No. 28 ("Mot."). The Court finds this matter suitable for disposition without oral argument pursuant to Civil Local Rule 7-1(b) and **VACATES** the November 20, 2025, hearing. For the reasons stated below, the Court **DENIES** the motion.[1]

## II.    BACKGROUND

**A.    Factual Background**

Dana, an Australian limited liability company with a principal place of business in Australia, is "engaged in the development of Android mobile applications."[2] First Amended

---

[1] The parties consent to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c). ECF Nos. 7, 14.

[2] Dana "has a single member, who is an individual citizen of the People's Republic of China." ECF No. 23.

Complaint ("FAC") ¶¶ 1, 13. Meta, a Delaware corporation with a principal place of business in California, operates the Audience Network ("AN"), "a monetization platform that allows third-party publishers and developers to display in-app advertisements sourced from Meta." *Id.* ¶¶ 2, 10. The AN generates revenue for third parties, like Dana, "each time a user views or clicks on [the advertisements]." *Id.* ¶ 10.

Overall, Dana alleges that Meta breached the Audience Network Terms ("AN Terms") by restricting Dana's payment account under the AN program and withholding all Dana's accrued revenue for July 2023. *Id.* ¶ 17.

**1.     The Parties' Relationship Through The Audience Network Program**

Meta operates the AN program which allows third-party publishers and developers to earn revenue by displaying advertisements sourced from Meta. *Id.* ¶ 10. Under the AN Terms, a "Publisher" is "the person or entity accepting" the AN Terms. *Id.*, Ex. B (AN Terms) (ECF No. 21-2). Publishers must agree to Meta's AN Terms to participate in the AN program. *Id.* ¶ 11.

In April 2023, Dana enrolled in the AN program as a Publisher and agreed to the AN Terms. *Id.* ¶ 14. Pursuant to the AN Terms, Dana "integrated both Meta and third-party advertisements . . . into its various mobile application platforms." *Id.* ¶ 15.

Dana includes a true and correct copy of the AN Terms with its FAC. *Id.* ¶ 11, Ex. B. The AN Terms require Publishers to comply with Meta's Audience Network Policy ("AN Policy"). *Id.* ¶ 12; *see* AN Terms, Section 3(3) ("Publisher will comply with Meta's Audience Network Policy ('Audience Network Policy'). Publisher will be solely responsible for all aspects of the Publisher Properties, including all content therein.") (emphasis omitted). Dana includes a true and correct copy of the AN Policy with its FAC. FAC ¶ 12; *see id.*, Ex. C (AN Policy) (ECF No. 21-3).

Relevant provisions of the AN Terms are as follows. A provision titled, "General Terms," states:

> Meta will work with Publisher to facilitate the placement of third-party and/or Meta advertisements or other commercial or sponsored content ("**Ads**") on certain of Publisher's properties, which may include Publisher's mobile applications, as set forth in the Audience Network Policy (as defined below) and approved by Meta in its sole

>discretion ("**Publisher Properties**"). If applicable, Meta will work with Publisher to facilitate the placement of Ads on Publisher's articles displayed on Meta's technologies through use of Meta Instant Articles or Publisher's games displayed through Meta's products or services through use of Instant Games, in which case such articles and/or games shall also be deemed "**Publisher Properties**" hereunder. Publisher agrees that these Audience Network Terms will apply to any use by Publisher of the Audience Network Service (as defined below). As between Meta and Publisher, Meta retains exclusive ownership of the Audience Network Service (which, for clarity, excludes Publisher Properties).

AN Terms, Section 1 (emphasis in original).

A provision titled, "Payment," states:

>Each month during the Term, for all Publisher Properties on which Ads were displayed during the previous month, (a) for Tag Integrations, Meta will pay Publisher a percentage of Net Revenue (defined below) arising from such Publisher Properties for the previous month as solely determined by Meta, and (b) for Bidding Integrations, Meta will pay Publisher the bid amount specified in a bid response for the delivery of an Ad to Publisher Properties for all Ads delivered to Publisher that were viewable (as determined by Meta) during the previous month. All payments will be made in accordance with this Section 4.1 unless otherwise agreed to by Meta in writing. '**Net Revenue**' means (a) the amounts actually collected by Meta from advertisers for Ads displayed on Publisher Properties using Tag Integrations, minus (b) deductions for fraud, bad debt, chargebacks, refunds, credit card processing fees, and any other third party fees. Publisher agrees to accurately complete and timely provide to Meta any forms or documentation that Meta determines is required to set up payment to Publisher, and Publisher may update such payment information upon notice to Meta provided that such information is complete and accurate and Publisher has the requisite authority to provide such information. Subject to the foregoing, approximately 21 days following the end of the calendar month in which the transaction occurred, Meta will pay Publisher the amounts associated with such calendar month. In the event a payment from Meta to Publisher for any given pay period would be less than One Hundred United States Dollars ($100.00), Meta reserves the right to roll such payment over month to month until such threshold is met (unless Publisher's account is being deactivated or terminated), at which time Meta will make the applicable payment to Publisher. Meta reserves the right to deduct from any payments due or payable to Publisher any amounts that are past due and remain uncollected by Meta from Publisher in connection with any other Meta product or service.

*Id.* at Section 4(1) (emphasis in original).

The Payment provision goes on to state:

>Publisher will not, and will not authorize or encourage any third party

3

> to, directly or indirectly, generate impressions, clickthroughs, conversions or other actions with respect to an Ad through any automated, deceptive, fraudulent or otherwise invalid means, including through repeated manual clicks, the use of 'robots' or other automated tools, or by payment of money, false representation, or any illegal or otherwise invalid for end users to take actions with respect to an Ad. Notwithstanding anything to the contrary in these Audience Network Terms, Meta will not be liable for any payment (a) based on such fraudulent activity or invalid activity, as determined by Meta in its discretion, or (b) in the event of any breach by Publisher of these Audience Network Terms (including the Audience Network Policy) during any applicable pay period. Meta reserves the right to withhold payment or charge back Publisher's account due to any of the foregoing pending Meta's investigation, or in the event that an advertiser whose Ads are displayed in connection with Publisher Properties defaults on payment for such Ads. Meta's records and figures will be used to determine all payments.

*Id.* at Section 4(2).

Relevant provisions of the AN Policy are as follows. A provision titled, "Introduction," states:

> 1. Developers are responsible for ensuring their apps comply with all applicable laws, statutes, and regulations. In addition to complying with all applicable laws and statutes, as well as the Audience Network terms, including these policies, developers are responsible for adhering to our guidance for developers.
>
> 2. Prior to onboarding, Publishers that maintain an ads.txt or app-ads.txt file must include Audience Network listed accurately.
>
> 3. We reserve the right to reject, approve or remove any Publisher or app for any reason, at our sole discretion, including Publishers and apps that negatively affect our relationship with our users or advertisers, or that promote content, services, or activities, contrary to our competitive position, interests, or advertising philosophy.
>
> 4. We may provide new or updated publisher quality standards at any time. You agree to comply with these standards, including any instructions or notices we may provide you relating to quality.
>
> 5. Violations of these policies may result in suspension or termination of your use of our services.
>
> 6. We analyze all ad engagement (i.e. clicks, impressions, views, installs, etc.) for patterns of abuse. If we determine that a publisher account might pose a risk to Meta, our users, or our advertisers, we may limit or disable that account.

AN Policy, Section Introduction.

4

**2.      Dana's Allegations Regarding Its Applications And Withheld Payments**

Dana alleges the following in the FAC.  "Under the AN Terms, Dana agreed to display Ads supplied by Meta or third-party [*sic*] within its mobile applications and was to receive revenue based on advertisement performance metrics."  FAC ¶ 24 (citing AN Terms, Sections 1, 3, 4).  Since enrolling in the AN program in April 2023, Dana has "fully complied with the AN Terms and AN Policy."  *Id.* ¶ 16.  Dana received regular payments from Meta for several months "in accordance with the AN Terms, confirming that Dana was performing as required."  *Id.*

In August 2023, Meta notified Dana "that several of Dana's applications had been blocked due to alleged policy violations," and Meta "restricted Dana's payment account and withheld all accrued advertising revenue for July 2023."  *Id.* ¶ 17.  Meta withheld "100% of Dana's accrued revenue, without any differentiation, individualized assessment, or genuine exercise of contractual discretion."  *Id.* ¶ 29.  "Meta provided no explanation of the alleged violations, nor did it provide any accounting or count of the alleged violations."  *Id.* ¶ 18.  Meta rejected Dana's appeals "without any substantive review or meaningful explanation."  *Id.* ¶ 19.  The total amount of revenue withheld by Meta from Dana exceeds $395,000.  *Id.* ¶ 20.

"Dana's own review of its applications and advertising traffic showed that the traffic was organic, consistent with historical user activity, and not materially different from the periods in which Meta paid Dana in full."  *Id.* ¶ 51.  Meta allowed Dana's revenue to accrue for months before invoking "policy violations" to withhold revenue from Dana.  *Id.* ¶ 52.  Meta applies its AN Policy "inconsistently, paying some publishers under materially similar circumstances while denying payment to Dana."  *Id.* ¶ 54.

When Dana reviewed the experiences publicly posted online by other developers, "Dana learned that Meta's conduct in this case is consistent with a broader pattern:  Meta routinely withholds accrued publisher revenue without explanation and without identifying the nature, number, or scope of the alleged violations."  *Id.* ¶ 19.

**B.      Procedural Background**

On May 1, 2025, Dana filed its initial complaint against Meta, alleging four claims under California law:  (1) Breach of Contract; (2) Breach of Implied Covenant of Good Faith and Fair

1  Dealing; (3) Quantum Meruit; and (4) Unjust Enrichment.  ECF No. 1.  On August 28, 2025, Meta

2  moved to dismiss all claims pursuant to Rule 12(b)(6).  ECF No. 19.

3        Dana filed the operative First Amended Complaint ("FAC") on September 10, 2025,

4  alleging two claims under California law:  (1) Breach of Contract; and (2) Breach of Implied

5  Covenant of Good Faith and Fair Dealing.  FAC ¶¶ 22–59 (ECF No. 21).  Dana seeks, *inter alia*,

6  damages and a declaratory judgment.  *Id.* at 11–12.  On September 10, 2025, the Court terminated

7  Meta's previous motion to dismiss as moot.  ECF No. 22.

8        On October 1, 2025, Meta filed the instant Motion to Dismiss pursuant to Rule 12(b)(6).

9  ECF No. 28 ("Mot.").  On October 22, 2025, Dana filed an Opposition.  ECF No. 29 ("Opp.").

10  On November 5, 2025, Meta filed a Reply.  ECF No. 30 ("Reply").

### III.  LEGAL STANDARD

12        A motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) "tests the legal

13  sufficiency of a claim.  A claim may be dismissed only if it appears beyond doubt that the plaintiff

14  can prove no set of facts in support of his claim which would entitle him to relief."  *Cook v.*

15  *Brewer*, 637 F.3d 1002, 1004 (9th Cir. 2011) (cleaned up).  Rule 8 provides that a complaint must

16  contain a "short and plain statement of the claim showing that the pleader is entitled to relief."

17  Fed. R. Civ. P. 8(a)(2).  Thus, a complaint must plead "enough facts to state a claim to relief that

18  is plausible on its face."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Plausibility does

19  not mean probability, but it requires "more than a sheer possibility that a defendant has acted

20  unlawfully."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A complaint must therefore provide a

21  defendant with "fair notice" of the claims against it and the grounds for relief.  *Twombly*, 550 U.S.

22  at 555 (citation omitted).

23        In considering a motion to dismiss, the court accepts factual allegations in the complaint as

24  true and construes the pleadings in the light most favorable to the nonmoving party.  *Manzarek v.*

25  *St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008); *accord Erickson v. Pardus*,

26  551 U.S. 89, 93–94 (2007).  However, "the tenet that a court must accept as true all of the

27  allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of

28  the elements of a cause of action, supported by mere conclusory statements, do not suffice."

1  *Iqbal*, 556 U.S. at 678.

2  If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no
3  request to amend the pleading was made, unless it determines that the pleading could not possibly
4  be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en
5  banc) (cleaned up). A court "may exercise its discretion to deny leave to amend due to 'undue
6  delay, bad faith or dilatory motive on part of the movant, repeated failure to cure deficiencies by
7  amendments previously allowed, undue prejudice to the opposing party . . ., [and] futility of
8  amendment.'" *Carvalho v. Equifax Info. Servs., LLC*, 629 F.3d 876, 892–93 (9th Cir. 2010)
9  (alterations in original) (quoting *Foman v. Davis*, 371 U.S. 178, 182 (1962)). Courts have broader
10 discretion in denying motions for leave to amend after leave to amend has already been granted.
11 *See Rich v. Shrader*, 823 F.3d 1205, 1209 (9th Cir. 2016) ("[W]hen the district court has already
12 afforded a plaintiff an opportunity to amend the complaint, it has wide discretion in granting or
13 refusing leave to amend after the first amendment, and only upon gross abuse will its rulings be
14 disturbed.") (cleaned up); *Chodos v. W. Publ'g Co.*, 292 F.3d 992, 1003 (9th Cir. 2002) ("[W]hen
15 a district court has already granted a plaintiff leave to amend, its discretion in deciding subsequent
16 motions to amend is particularly broad.") (cleaned up).

## IV.  DISCUSSION

Meta moves to dismiss both of Dana's claims for failing to state a cognizable claim. Mot. at 2. In sum, the Court concludes that Dana alleges cognizable claims for breach of contract and breach of the implied covenant of good faith and fair dealing—therefore, dismissal of Claims 1 and 2 is not warranted.

**A.  Breach Of Contract Claim**

Meta argues that the Court should dismiss Dana's Breach of Contract claim (Claim 1) because "the AN Terms expressly allow Meta to withhold payment if it determines that a publisher has engaged in misconduct as determined by Meta," and allow "Meta to remove a publisher for any reason, at Meta's sole discretion." Mot. at 2:20–25. Dana contends that Meta breached the AN Terms by withholding Dana's revenue because the AN Terms do not give Meta discretion to withhold all payments to publishers. Opp. at 6:20–7:21. Dana further contends that

7

1    any provisions of the AN Terms "that enable Meta to confiscate earned revenue while insulating

2    itself from accountability" are unconscionable and invalid liquidated damages provisions. *Id.* at

3    16:18–27:26.

4         To prevail on a breach of contract claim under California law, a plaintiff must prove "(1) a

5    contract, (2) plaintiff's performance or excuse for nonperformance, (3) defendant's breach, and (4)

6    damage to plaintiff." *Troyk v. Farmers Grp., Inc.*, 171 Cal. App. 4th 1305, 1352 (2009). "Implicit

7    in the element of damage is that the defendant's breach *caused* the plaintiff's damage." *Id.*

8    (emphasis in original). Whether a party breached a contract is a question of fact. *Locke v. Warner*

9    *Bros.*, 57 Cal. App. 4th 354, 365 (1997).

10        Here, the Court concludes that Dana alleges a cognizable breach of contract claim against

11   Meta. The parties' dispute turns on whether the AN Terms permit Meta to withhold *all revenue*

12   from a publisher or only *the portion* of the revenue based on policy violations. *Compare* Mot. at 9

13   n.2 ("[Dana] ignores that—on the face of the AN Terms—Meta is entitled to withhold full

14   payment in the event of any single breach by the Publisher of the AN Terms or AN Policy.") *with*

15   Opp. at 7:11–14 ("Properly read, Section 4(2) limits Meta's authority to withhold only those

16   payments *based on* fraudulent or invalid activity or related to an actual breach by the publisher. It

17   does not authorize withholding all payments in full.") (emphasis in original).

18        The Court agrees with Dana that it sufficiently alleges that Meta breached the contract

19   when Meta withheld "*all* payments in their entirety without distinguishing between valid and

20   allegedly invalid activity." FAC ¶ 28 (emphasis in original); *see* Opp. at 6:20–25. In California,

21   contract interpretation is a question of law "when it is based on the words of the instrument

22   alone[.]" *City of Hope Nat'l Med. Ctr. v. Genentech, Inc.*, 43 Cal. 4th 375, 395 (2008). The

23   Payment provision of the AN Terms states:

24   > Publisher will not, and will not authorize or encourage any third party to, directly or indirectly, generate impressions, clickthroughs, conversions or other actions with respect to an Ad through any automated, deceptive, fraudulent or otherwise invalid means, including through repeated manual clicks, the use of 'robots' or other automated tools, or by payment of money, false representation, or any illegal or otherwise invalid for end users to take actions with respect to an Ad. Notwithstanding anything to the contrary in these Audience Network Terms, Meta will not be liable for any payment (a) based on

8

> such fraudulent activity or invalid activity, as determined by Meta in its discretion, or (b) in the event of any breach by Publisher of these Audience Network Terms (including the Audience Network Policy) during any applicable pay period. Meta reserves the right to withhold payment or charge back Publisher's account due to any of the foregoing pending Meta's investigation, or in the event that an advertiser whose Ads are displayed in connection with Publisher Properties defaults on payment for such Ads. Meta's records and figures will be used to determine all payments.

AN Terms, Section 4(2). By its plain terms, Section 4(2) provides that Meta "will not be liable for any payment" based on fraudulent or invalid activity or for any breach by a Publisher of the AN Terms. *Id.* While the provision states that Meta can determine what constitutes fraudulent and invalid activity "in its discretion," the provision does not state that Meta has discretion to withhold revenue from a Publisher for *any reason*. *See* Opp. at 7:1–14, 9:7–15. This interpretation finds support in other provisions of the AN Terms. *See Lemm v. Stillwater Land & Cattle Co.*, 217 Cal. 474, 480 (1933) ("Although the language of the contract must govern its interpretation (Civ. Code, §§ 1638, 1639), nevertheless the meaning is to be obtained from the entire contract, and not from any one or more isolated portions thereof."). The Payment provision defines "Net Revenue" as:

> (a) the amounts actually collected by Meta from advertisers for Ads displayed on Publisher Properties using Tag Integrations, minus (b) deductions for fraud, bad debt, chargebacks, refunds, credit card processing fees, and any other third party fees.

AN Terms, Section 4(1). Thus, Section 4(1) provides that "Meta may deduct or exclude fraud-related amounts from payment—not withhold all accrued revenue outright." Opp. at 7:15–22. And in contrast to Section 4(2), other provisions provide Meta discretion to act for *any reason*. *See* AN Policy, Section Introduction (3) ("We reserve the right to reject, approve or remove any Publisher or app for any reason, at our sole discretion[.]"). As such, Dana plausibly alleges that Meta improperly withheld all revenue from Dana, including revenue not associated with invalid activity or a breach, in violation of the AN Terms. FAC ¶ 28.

In addition, Dana points to principles of contract interpretation to support its argument that "even if Meta could demonstrate that [Dana] breached as to certain ad serves, it cannot withhold payments for all the other ad serves" because "the advertising transactions are divisible." Opp. at 8:8–11 (citing FAC ¶ 29). Meta responds that Dana "cites to no provision that provides for the

9

divisibility of payments after a Publisher's invalid activity or breach, nor any contractual provision that requires Meta to remit partial payment." Reply at 1:10–20. But such a provision is not required—under California law, "if a party has breached one part of a divisible contract, he or she is not precluded from obtaining the consideration that was allocated to that portion of the contract that he or she performed." *Filet Menu, Inc. v. C.C.L. & G., Inc.*, 79 Cal. App. 4th 852, 860 (2000) (citing *Lowy v. United Pac. Ins. Co.*, 67 Cal. 2d 87, 92 (1967)). Where, as here, a contract apportions consideration, it is divisible. *Lowy*, 67 Cal. 2d at 91; *see* AN Terms, Section 4(1) (apportioning consideration to Publishers monthly). The consideration apportioned under the AN Terms is further divisible; the AN Terms specify that Publishers' revenue depends on the number of Publisher Properties—like mobile applications—and the number of Ads displayed on these Publisher Properties. *See* FAC ¶ 24 (citing AN Terms, Sections 1, 4). Thus, Dana plausibly alleges that even if some of its mobile applications engaged in improper conduct, it should have received revenue for the portion of the agreement that it performed for its applications that did not engage in improper conduct. *See id.* ¶ 17 (alleging that Dana received notice from Meta "that several of Dana's applications had been blocked due to alleged policy violations"). Therefore, the AN Terms or AN Policy do not preclude Dana's breach of contract claim as a matter of law.

Meta's cited cases do not compel a different conclusion. *See* Mot. at 7:13–9:9. Meta asserts that "[c]ourts have consistently held that where a contract allows a party to take a certain action—as is the case here—that action is not a breach of contract." *Id.* at 7:13–14. But even if true, this is immaterial. As discussed, the AN Terms do not allow Meta to take the action that Dana challenges as improper: withholding all payments to Publishers regardless of their connection to invalid activity. Opp. at 6:20–25.

Further, Meta's remaining arguments are unpersuasive. Meta cites no authority for its proposition that Dana must somehow show that it was possible to segregate "compliant activity" from "invalid activity" and identify "whether the withheld amount for July 2023 was already determined to be an amount attributable to the 'invalid activity.'" Mot. at 9 n.2. Dana alleges that it fully complied with the AN Terms and AN Policy, and that even if some ads "were deemed non-compliant in Meta's view, the contract did not authorize Meta to withhold the entirety of earned

10

revenue[.]" FAC ¶¶ 16, 29; *see* Opp. at 11:6–8. This is sufficient at the pleading stage, especially where the records identifying Dana's purported invalid activity "are solely within Meta's possession and control." Opp. at 10:26–11:6; *see Scheibe v. ProSupps USA, LLC*, 141 F.4th 1094, 1100 (9th Cir. 2025) ("And the fact that defendants may have exclusive control and possession of critical facts—like their own product inventory—cannot categorically prevent plaintiffs from stating a plausible claim."). Meta also argues that there is no contractual provision "requiring Meta to provide a Publisher with an explanation or accounting of any violation." Mot. at 9:10–10:8. While that may be true, Dana clarifies in its Opposition that "[t]he absence of an explanation is not pled as a separate breach—it is evidence that Meta's withholding of all accrued revenue was arbitrary and unsupported by any identified 'invalid activity' or 'breach.'" Opp. at 10:13–20 (citing FAC ¶ 29).

Accordingly, the Court **DENIES** Meta's motion to dismiss Dana's Breach of Contract claim (Claim 1). Given the Court's ruling, it need not reach Dana's arguments regarding unconscionability and liquidated damages.

## B.   Breach Of Implied Covenant Of Good Faith And Fair Dealing Claim

Meta argues that the Court should dismiss Dana's Breach of Implied Covenant of Good Faith and Fair Dealing claim (Claim 2) because (1) "it is based on the same alleged acts as the breach of contract claim, which are expressly authorized under the applicable agreements"; and (2) Dana "has not pleaded any facts showing that Meta acted in bad faith." Mot. at 2:25–28. Dana contends that (1) it sufficiently alleges two separate claims, even if they are supported by the same facts; and (2) "the FAC pleads detailed facts supporting the inference that Meta acted in bad faith and abused its contractual discretion." Opp. at 11:10–16:17.

Under California law, "[t]he covenant of good faith and fair dealing, implied by law in every contract, exists merely to prevent one contracting party from unfairly frustrating the other party's right to receive the *benefits of the agreement actually made*." *Guz v. Bechtel Nat. Inc.*, 24 Cal. 4th 317, 349 (2000) (emphasis in original). "Just what conduct will meet this criteria must be determined on a case by case basis and will depend on the contractual purposes and reasonably justified expectations of the parties." *Careau & Co. v. Sec. Pac. Bus. Credit, Inc.*, 222 Cal. App.

11

3d 1371, 1395 (1990).  "[A] breach of the covenant of good faith and fair dealing is prompted not by an honest mistake, bad judgment or negligence but rather by a conscious and deliberate act." *A.L. v. Pleasanton Unified Sch. Dist.*, No. 22-cv-03036-CRB, 2023 WL 5209718, at *3 (N.D. Cal. Aug. 14, 2023) (cleaned up).  Whether the covenant has been breached is a question of fact.  *Hicks v. E.T. Legg & Assocs.*, 89 Cal. App. 4th 496, 509 (2001).

To prevail on a claim, a plaintiff must show:  "(1) the plaintiff and the defendant entered into a contract; (2) the plaintiff did all or substantially all of the things that the contract required him to do or that he was excused from having to do; (3) all conditions required for the defendant's performance occurred; (4) the defendant unfairly interfered with the plaintiff's right to receive the benefits of the contract; and (5) the defendant's conduct harmed the plaintiff."  *Chou v. Charles Schwab & Co.*, No. 21-cv-06189-LB, 2022 WL 1127384, at *6 (N.D. Cal. Mar. 22, 2022).

Here, the Court concludes that Dana alleges a cognizable implied covenant claim against Meta.  Meta first argues that Dana's claim fails because it is "based on Meta withholding [Dana's] accrued advertising revenue," and "the AN Terms expressly permit Meta to do so."  Mot. at 11:14–28; *see also* Reply at 5:14–24 ("By doing what the AN Terms and AN Policy expressly allowed, Meta cannot violate the implied covenant").  To be sure, the implied covenant "cannot be read to require defendants to take a particular action that is discretionary under the contract when the contract also expressly grants them the discretion to take a different action."  *Bevis v. Terrace View Partners, LP*, 33 Cal. App. 5th 230, 256 (2019).  However, "[t]he covenant of good faith finds particular application in situations where one party is invested with a discretionary power affecting the rights of another.  Such power must be exercised in good faith."  *Carma Devs. (Cal.), Inc. v. Marathon Dev. California, Inc.*, 2 Cal. 4th 342, 372 (1992).  Therefore—as alleged by Dana—the issue underlying the implied covenant claim is whether "Meta's exercise of discretion was arbitrary, self-serving, and contrary to the parties' legitimate expectations under the agreement." Opp. at 13:4–10 (citing FAC ¶¶ 50–56).  In other words, the question for this claim is not whether Meta had discretion to withhold Dana's revenue under the AN Terms but whether Meta exercised any discretion it had to withhold Dana's revenue in good faith.  Indeed, courts in

12

this district have found similar claims cognizable at the pleading stage.[3] *See Free Range Content, Inc. v. Google Inc.*, No. 14-cv-02329-BLF, 2016 WL 2902332, at *1, 16 (N.D. Cal. May 13, 2016) (concluding implied covenant claim survived dismissal where Google's Terms of Service stated, "Payments to you may be withheld to reflect . . . any amounts arising from invalid activity, *as determined by Google in its sole discretion*," and where plaintiff alleged Google withheld payments without exercising discretion in good faith) (emphasis in original).

Moreover, the Court agrees with Dana that it sufficiently alleges that Meta breached the implied covenant by invoking "a discretionary clause to justify arbitrary conduct that directly undermines the contract's purpose." Opp. at 13:4–10. Contrary to Meta's assertion, Dana alleges facts showing that Meta acted in bad faith. Mot. at 12:10–13:5. In the FAC, Dana alleges: Dana fully performed under the AN Terms; Dana's internal review showed that its advertising traffic was organic; Meta withheld all Dana's accrued revenue without identifying invalid activity; Meta withheld Dana's revenue, after allowing it to accrue for months, based on unspecified "policy violations"; and reports from other developers demonstrate that Meta engaged in a broader pattern of improperly withholding Publisher revenue. Opp. at 14:8–16:11 (citing FAC ¶¶ 17–19, 29, 51–54). Collectively, these alleged facts—taken as true at this stage—support "the inference that Meta acted in bad faith and abused its contractual discretion." *Id.* at 14:12–15.

Next, Meta argues that Dana's claim "based on the withheld payment fails because it is based on the same alleged 'breaching' conduct that underlies the breach of contract claim." Mot. at 12:2–9; *see also* Reply at 4:15–16 ("[Dana's] implied covenant claim is entirely coextensive with its breach of contract claim, as both arise from the alleged July 2023 payment withholding."). Not so. It is true that "where breach of an actual term is alleged, a separate implied covenant

---

[3] In its Reply, Meta attempts to distinguish *Free Range Content* from this case by stating that the former was a "class action brought against Google." Reply at 7:7–12. But Meta cites to no authority holding that an individual plaintiff's claim for a breach of the implied covenant is less cognizable than a claim alleged by several plaintiffs for the same alleged improper exercise of contractual discretion. And in any event, Meta is incorrect that Dana does not allege "widespread practices of indiscriminate withholding of payments." *Id.* As discussed, Dana does just that—it alleges, "Dana learned that Meta's conduct in this case is consistent with a broader pattern: Meta routinely withholds accrued publisher revenue without explanation and without identifying the nature, number, or scope of the alleged violations." FAC ¶ 19.

13

1  claim, based on the same breach, is superfluous." *Guz*, 24 Cal. 4th at 327.  However, in the FAC,
2  Dana "alleges not only that Meta's withholding breached the contract, but also that Meta abused
3  its contractual discretion, acted in bad faith, and interfered with [Dana's] ability to benefit from
4  the agreement."  Opp. at 15:24–16:11 (citing FAC ¶ 56).  Put another way, Dana alleges that (1)
5  Meta breached the AN Terms by withholding all Dana's revenue; and (2) Meta breached the
6  implied covenant by exercising its discretion to withhold Dana's revenue in bad faith—even if
7  some or all the withholding was permitted by the AN Terms—because none of Dana's revenue
8  was based on improper activity.  Therefore, because the question of whether the AN Terms
9  permitted Meta to withhold Dana's revenue is separate from the question of whether Meta invoked
10 the AN Terms as a means to prevent Dana from benefitting from the agreement, the two claims are
11 not based on the same breach.

      Accordingly, the Court **DENIES** Meta's motion to dismiss Dana's Breach of Implied Covenant of Good Faith and Fair Dealing claim (Claim 2).

### V.     CONCLUSION

For the reasons stated above, the Court **DENIES** Meta's Motion to Dismiss.

**IT IS SO ORDERED.**

Dated: November 13, 2025

THOMAS S. HIXSON
United States Magistrate Judge

14